FORD MOTOR CREDIT COMPANY *v.* Doris ELLISON

97-607                                          974 S.W.2d 464

Supreme Court of Arkansas
Opinion delivered September 24, 1998

*Davidson & Associates, P.A.*, by: *Bob Davidson*, for appellant.

*Cheryl K. Maples*, for appellee.

DONALD L. CORBIN, Justice. This is a contract case. Appellant Ford Motor Credit Company (FMC) appeals the order of the Union County Circuit Court finding in favor of Appellee Doris Ellison on its contract claim against her. Ellison purchased a car in 1991 and was making payments to FMC pursuant to an installment contract. FMC repossessed the car in December 1993, and subsequently sold the car at auction. In September 1994, FMC

brought suit against Ellison to obtain a deficiency judgment in the amount of $3,791.77, the difference of the amount owed on the contract and the sales price of the car at auction, plus costs and attorney's fees. This case was certified to us from the court of appeals, as it presents an issue of first impression requiring our interpretation of Ark. Code Ann. § 4-2-609 (Repl. 1991); hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(d). We affirm the trial court's judgment.

This action was tried before the court, sitting as the factfinder, on January 24, 1997. The record reflects the following facts. On September 30, 1991, Ellison purchased a 1990 Ford Escort from Hagood Ford Company and, after receiving credit for a trade-in vehicle, financed the balance of the purchase price through FMC. Ellison had previously financed a vehicle purchase through FMC and had fulfilled her contractual obligations. Ellison had been gainfully employed for a number of years at ConAgra and had an unblemished credit record. Ellison was married during the time in question, but the title to the 1990 Ford Escort was solely in her name, as was the installment contract. During March or April of 1993, Ellison's husband was arrested in the Ford Escort by the Thirteenth Judicial District Drug Task Force. The task force impounded Ellison's car for a period of time and then released it to FMC in July 1993, advising FMC that if the car were impounded again, FMC's lien may not be protected. Based on this information, FMC advised Ellison that pursuant to section 4-2-609, additional security would be required before FMC would release the car to her. Ellison was not able to produce such security, and in December 1993, FMC sent her notice that it was repossessing the car. Ellison had continued to make payments to FMC after the car had been seized, before eventually defaulting on the note. FMC then sold the car at auction and filed this action against Ellison. Prior to repossessing the car, FMC did not investigate the criminal charges against Ellison's husband, who was later acquitted.

With respect to the applicability of section 4-2-609, the trial court found:

> [FMC's] reliance on the statement of the Drug Task Force that [FMC's] lien could not be protected if they seized the vehicle a

second time does not constitute reasonable grounds for insecurity. That insecurity is directed at the ability of [Ellison] to continue to perform her obligations. At that time, there was no evidence available to [FMC] that [Ellison] could not or would not make her monthly payments. To the contrary, [Ellison] was current in her obligations under this contract, had fully and completely performed a prior contract with plaintiff and continued to be gainfully employed and had an unblemished credit record. *The legal problems of a third party not a signatory to the contract and a statement by law enforcement about its future position on a contingent possibility are not sufficient to justify the demand of [FMC] for additional security from [Ellison].* The subsequent default by [Ellison] by which the vehicle was repossessed was a direct result of the unreasonable action of [FMC] and for which [Ellison] should not be held liable. [Emphasis added.]

FMC argues that the trial court erred in ruling that there were no reasonable grounds for insecurity under section 4-2-609 and in finding that Ellison was current in her payments at the time of repossession. FMC asserts that it had reasonable grounds for insecurity based upon (1) the task force's statement about FMC's lien not being protected in the event of a future seizure, and (2) Ellison's failure to make timely payments under the terms of the finance contract. FMC argues further that it had the right to later repossess the car, in any event, due to Ellison's failure to make timely payments on the car.

In bench trials, the standard of review on appeal is whether the trial judge's findings were clearly erroneous or clearly against the preponderance of the evidence. ARCP Rule 52(a); *McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 961 S.W.2d 729 (1998). We view the evidence in a light most favorable to the appellee, resolving all inferences in favor of the appellee. *Id.* Disputed facts and determinations of the credibility of witnesses are within the province of the factfinder. *Id.* For the reasons set out below, we affirm the trial court's ruling that there were no reasonable grounds for FMC's insecurity in this case.

There is no Arkansas case law interpreting section 4-2-609, which is identical to § 2-609 of the Uniform Commercial Code. That section provides in pertinent part:

> (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. *When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance* and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return. [Emphasis added.]

We adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Leathers v. Cotton*, 332 Ark. 49, 961 S.W.2d 32 (1998). In determining the meaning of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* If the language is plain and unambiguous, our analysis need go no farther. *Burcham v. City of Van Buren*, 330 Ark. 451, 954 S.W.2d 266 (1997). It is evident from the plain language of section 4-2-609 that a demand for adequate assurance of performance may only be made by one party to a sales contract upon the other party if there are reasonable grounds for insecurity that the other party will not perform his or her contractual obligation, thus impairing the first party's expectation of receiving due performance.

Section 4-2-609(2) specifically provides that for sales transactions between merchants, commercial standards are to be used in determining the reasonableness of the grounds for insecurity. Here, however, we are presented with a sales transaction between a merchant and a consumer. Because this is an issue of first impression in this state, we look beyond our laws for guidance in determining the appropriate burden of proof. Professor William Hawkland has written that for sales transactions between a merchant seller and a nonmerchant buyer, the test for determining whether the seller has reasonable grounds for insecurity is whether a *reasonable merchant* in the seller's position would have that feeling. 3 William D. Hawkland, *Uniform Commercial Code Series* § 2-609:02, at p. 208 (1994). A party claiming that its conduct is justified by section 4-2-609 and that damages are warranted bears the burden of proving the applicability of that section. *See* 4 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2-609:11, at p. 499 (3d ed. 1997); *see also Cargill, Inc. v. Storms Agri Enters.,*

*Inc.*, 46 Ark. App. 237, 878 S.W.2d 786 (1994) (holding that the party seeking damages under Ark. Code Ann. § 4-2-610 (Repl. 1991) must prove that the conduct was justified under that section). Whether the demanding party has reasonable grounds for insecurity is a question to be decided by the trier of fact. *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186 (5th Cir. 1984); *S & S, Inc. v. Meyer*, 478 N.W.2d 857 (Iowa Ct. App. 1991).

▇ There are several circumstances that may be considered in determining whether the demanding party has reasonable grounds for insecurity: (1) the nature of the sales contract; (2) the repetition by the party upon whom demand is made of conduct that caused insecurity in other transactions; (3) insecurity existing in the performance of other contracts unrelated legally to the contract at issue; (4) the expanding use of a credit term by the party upon whom demand is made; and (5) reputation and rumors concerning the stability and conduct of the party upon whom demand is made. Anderson, § 2-609:37, at p. 509-10. "A seller does not have reasonable grounds for insecurity when the buyer is clearly financially able and willing to pay for delivered goods[.]" Anderson, § 2-609:55, at p. 515.

We are aware of no case interpreting section 2-609 of the Uniform Commercial Code involving the particular facts of this case. In *Ford Motor Credit Co. v. Alachua Trading Co., Inc.*, 531 So. 2d 982 (Fla. Dist. Ct. App. 1988), however, the Florida District Court of Appeals was faced with a similar factual scenario requiring construction of § 672.609 of the Florida Statutes, Florida's version of section 2-609. In that case, Ford held an installment financing contract for a car purchased by the appellees. The car was seized by the United States Drug Enforcement Agency (DEA), in connection with an alleged illegal drug transaction, and later returned to Ford with instructions that should Ford release the car to appellees, the agency would again confiscate it and not return it to Ford. As in the present case, the appellees were current in their payments under the contract at the time of seizure, and the alleged drug transaction was committed while the car had been loaned to a third party. Unlike this case, however, Ford made no written demand for adequate assurance from the

appellees, opting instead to treat the contract as if it had been breached. While not actually reaching the issue concerning the reasonableness of Ford's grounds for insecurity, the Florida court stated:

> *The potential for a forfeiture claim as to the vehicle, and appellant's knowledge that the vehicle was used in connection with a drug transaction, prompts appellant's concern for its security interest. . . .* But appellant seeks to deem the contract breached under the statute without having sought any assurance of performance in accordance with the statutory procedure. We do not address the question of what assurance might be sufficient in these circumstances, but we conclude that appellant may not ignore the statutory procedure. [Emphasis added.]

*Id.* at 984.

Although we find that language somewhat persuasive, we do not believe that it is dispositive of the particular issue in the present case. The pertinent facts of that case are distinguishable from those here. In the Florida case, Ford was instructed by the DEA that if it returned the vehicle to the appellees, the DEA would confiscate it again and not return it to Ford. In other words, the car was released to Ford by the DEA on the condition that it not be subsequently returned to the appellees. Here, the task force merely informed FMC that in the event the car was seized again in the future, the task force could not assure FMC that its lien would be protected. Those are two entirely different scenarios. In the Florida case, the instructions from the DEA were mandatory and definite, while the present case involved only a lack of assurance from the task force as to what might happen if the car was seized again. There was no indication in this case that the task force had any reason to believe that Ellison's car would be seized again. Furthermore, the evidence in this case showed that this was the first time FMC had demanded a surety bond from a customer based on information from a police task force.

FMC's account representative Sam Hayes testified that he was not aware of any other occasion when a vehicle had been seized by a drug task force and then released to FMC where it had demanded a surety bond or other assurance of payment from its customer. In response to Ellison's counsel's question whether

FMC will, after a seizure has occurred, generally return the car to the person purchasing it, Hayes stated, "If we feel that the person will continue to make payments and we'll not lose lien on the vehicle, yes." When Ellison's counsel, Ms. Maples, asked what type of investigation FMC does to determine whether there is adequate security of payment, Hayes stated that it depended upon the situation of each account. When asked if he had done any investigation into Ellison's ability to continue making her payments or the facts surrounding the police seizure, Hayes replied that he had depended upon the information received from the task force. The exchange is as follows:

CROSS EXAMINATION OF MR. HAYES BY MS. MAPLES

. . . .

Q.    You did not do any independent investigation into their ability or her ability to keep up the payments and as to your security?

A.    Well, she was in contact with us so we had — *she was continuing to make the payments* — so we were in contact with her as far as making the payments.

Q.    But you did no investigation into her ability or into your risk associated with her making the payments on your vehicle?

A.    We didn't need to do an investigation as far as — *she was making the payments.* [Emphasis added.]

Hayes additionally admitted that he had not conducted any investigation into Ellison's home situation to find out whether she was the primary driver of the car, whether her husband ever drove the car, or anything else in order to find out whether FMC had a risk involved in returning the car to Ellison.

Ellison confirmed Hayes's testimony about a lack of investigation by FMC prior to demanding additional assurance of performance. She stated that she had never been asked by anyone at FMC whether she was involved in the drug charge, and that she had never been questioned by anyone at FMC about her ability to continue to pay for the car. She stated that prior to the seizure,

she had no flaws in her credit record, that she was still working for ConAgra, and that she had always paid her debts.

From the foregoing testimony, we conclude that the trial court's ruling that FMC did not have reasonable grounds for insecurity was not clearly erroneous or clearly against the preponderance of the evidence. Hayes never satisfactorily explained the decision in this case to require a surety bond before returning the car to Ellison, which is particularly troublesome given Hayes's testimony that he did not need to investigate her ability to continue making payments, *because he knew that she was making the payments on the car*. Notwithstanding this knowledge, there was apparently no consideration by FMC of Ellison's ability to continue making payments, the fact that she was gainfully employed, or the fact that she had previously successfully completed payments on an installment contract for another vehicle with FMC.

Given FMC's general policy of returning seized vehicles to its customers in every other situation but this one, there were no reasonable grounds for insecurity in this particular case. We agree with the trial court that it was unreasonable for FMC to rely solely upon the information supplied by the task force that it could not assure FMC that its lien would be protected in the event of a future seizure of the car. We further agree that there is too much uncertainty and contingency in such information, as it had nothing to do with Ellison's ability to perform her obligations under the terms of the installment contract. Thus, FMC had no reasonable grounds under section 4-2-609 to retain Ellison's car and demand additional assurance of performance from her.

FMC alternatively contends that it was entitled to demand adequate assurance from Ellison on the ground that she had defaulted under the terms of the finance contract.[1] We are not persuaded by this argument. The record reflects that although

---

[1] FMC relies on specific provisions of the finance contract that are not included in the abstract, but were only set out in the argument portion of its brief. As such, we do not consider those contract provisions, as it is fundamental that the record on appeal is confined to that which is abstracted and cannot be contradicted or supplemented by statements made in the argument portions of the briefs. *National Enters., Inc. v. Rea*, 329 Ark. 332, 947 S.W.2d 378 (1997).

Ellison began making late payments after the task force had seized the car, FMC was accepting the late payments and merely adding on extra fees. The letter written by FMC to Ellison demanding further assurance of payment from her indicates that as of July 13, 1993, the date the letter was written, Ellison was only past due for her June 30, 1993 payment plus $68 in late charges. The issue then is whether FMC had reasonable grounds for insecurity to justify its demand for either full payment on the balance of the contract or a surety bond based solely on the fact that Ellison's account was past due approximately thirteen days for one payment.

■ ■ The exhibits presented below show that Ellison was never more than thirty-seven days late on a payment; the majority of her late payments were late only ten days or less. FMC clearly accepted late payments and merely added late fees when such payments were received, rather than instituting immediate repossession of the car. A seller may waive its rights to strict compliance with the terms of the finance contract where it has established a course of dealing of accepting late payments from the buyer. *Mercedes-Benz Credit Corp. v. Morgan*, 312 Ark. 225, 850 S.W.2d 297 (1993). The waiver remains in effect until such time that the seller notifies the buyer that the seller will no longer accept late payments and will henceforth require strict compliance with the contract. *Id.* There was no notice of strict compliance given here. As such, FMC should not now be permitted to claim that it had reasonable grounds for believing that Ellison would not perform her contractual obligations.

Lastly, we address FMC's argument that the trial court erred in finding that Ellison was current in her payments at the time of repossession. Ellison asserts that it is clear from the trial court's order that the court meant to state that she was current in her payments at the time of seizure, rather than repossession. She argues that the error is thus harmless. FMC contends that the erroneous finding was a primary reason for the trial court's ruling against it, and as such, constitutes a clear and manifest abuse of discretion requiring reversal.

We agree with FMC that this factual finding was erroneous, but we do not agree that it was a primary reason for the trial court's ruling. Rather, we conclude that the error was harmless and does not warrant reversal, as it was not essential to the trial court's ruling that information from law enforcement about a possible future occurrence did not constitute reasonable grounds for insecurity to support FMC's retainment of the car while it demanded additional security from Ellison. FMC failed to meet its burden of proving that its actions were justified under section 4-2-609 or that they were reasonable under the circumstances. Accordingly, we conclude that the trial court's ruling was not clearly erroneous or clearly against the preponderance of the evidence.

Affirmed.